The Court is familiar with this case as it came up first and was resolved in February of 2014 in Kmak 1 and in that case the Court was reviewing a motion to dismiss and taking the allegations of the complaint as true. The Second Amendment complaint held that Mr. Kmak's allegations were sufficient, if proven, to state a cause of action. Specifically, the Court noted a couple of things that are important, I think, for this case. First of all, the Court noted that there was a, what the Court referred to as a veiled threat letter in May of 2011, which preceded the call of Mr. Kmak's stock by six months. And secondly, the Court said, and if I may quote, more telling, the allegation that American Century elected to call only Kmak's shares in December of 2011, one to three days within the time they had received it. We didn't establish any law, factual law, in the case. We're now reviewing a, was it a bench trial? It was a motion to denial of summary judgment, or grant of summary judgment, I'm sorry, on behalf of the defendants. All right, but we're not, we now have a summary judgment record. We do, Your Honor. And that's what we care about. My point would be that the quote that was in Kmak 1 said that these facts established, it said, the reasonable inference here is that American Century wanted to retaliate and waited until after the arbitration award had been paid, and that was the clear inference that was drawn from the Second Amendment complaint. Now, Your Honor, we know that not only was Mr., we have proof that Kmak was the only one called. It was called on the same day that the award was paid. It was paid on the same, You're reading our opinion as drawing ultimate conclusions. We were doing nothing but reviewing the plausibility of the complaint. I understand. Let's talk about, you were given an opportunity to prove the theory that was outlined, and the district courts concluded you didn't do it on a record that we didn't have. That's what we're worried about. But what does that record, was that record properly analyzed? And my first point, Your Honor, would be simply that we have proven the allegations of the Second Amendment complaint on which you found a clear inference. We have additional evidence that wasn't in the Second Amendment complaint that Mr. Kmak, or that American Century was investigating J.P. Morgan, Mr. Kmak's employer, from as early as 2005 and 2006, before Mr. Kmak left in 2007. We know it was common knowledge that American Century, around American Century, that he would be a witness in any dispute involving American Century and J.P. Morgan. We know that they treated him differently. These are things that weren't in the Second Amendment complaint that are within the record on the summary judgment motion. We know that American Century's informal policy was to give everybody, when they left their employment of American Century, or in this case J.P. Morgan, 18 months' notice of their call because that was important. They had a good reason not to. The district court analyzed it at great length. Your Honor? And the good reason was because of the pending arbitration in which your client helped American Century. I think to reach that conclusion, Your Honor... Or, and maybe someone ironically established himself as one of the villains in the claim for which American Century recovered. Your Honor, to reach that conclusion, I believe the district court, and respectfully this court, would have to say, we're taking inferences in favor of the moving party. Under the summary judgment standard, the inferences are supposed to be taken in the most favorable... You have to prove this is all pretextual. As you know from our briefs, Your Honor, we don't believe the district court analyzes properly. This is a breach of contract case. So you think the district court erred by following what was the law of the case, which was that there is a useful analogy to be pursued here, which is exactly what the district court did. Because after pursuing that analogy, it said, and even if I didn't use the McDonnell-Douglas format, I'd reach the same conclusion. Correct. So for you to suggest that that was an error of law analytically is, in my view, almost ludicrous. Well, Your Honor, this court said in CAMAC 1 that employment cases are analogous. Both sides cited employment cases because that's where the body of law is on retaliation and adverse action taken against somebody for a potential violation of public policy, and in this case, testifying. What the district court did was apply the employment discrimination text or framework in which all you have to do as a defendant is to present some justification, which does not even require by a preponderance of the evidence, and then it throws the burden back on Mr. CAMAC to disprove what American Century has said as the explanation. We believe that if you look at the reasonable inferences from the list of items that have developed since the second amended complaint, that there are plenty of inferences that can be taken in favor of Mr. CAMAC. I don't deny, Your Honor, that a jury could reasonably infer that because American Century calls everybody stock at some time. They called Mr. CAMAC stock just in that general policy, and if it weren't for what they denied him in notice at 18 months, denied him in notice at three months, denied notice that they'd made the decision, had executives and general counsel attend his testimony at deposition, had general counsel and associate general counsel attend his trial testimony, 20 days later draft a letter that says we're calling his stock, decide not to call that stock, and instead on May 17th of 2011 they send him a reminder letter, unprecedented in multiple ways, signed by somebody who never sent the letters, prepared by somebody who never sent the letters, cc'd to two people who never received cc's. And then when he asked, are you going to call my stock, they waffled and they dithered. Well, how long, so what do you think American Century was required to do in this case? They're good. So what, give an 18-month notice at that point or what? Here's what I think, I think they had a couple things they could have done. Because everybody agrees they always called the stock, right? At some point they always called the stock. So your argument is the timing. The timing was retaliatory is what you're arguing. Obviously temporal proximity is one thing. As the case has indicated... No, no, I mean the timing itself was the retaliatory act. Because if they called everybody's stock, then calling stock is not retaliatory. It's the timing of the call. That is basically what you're saying, right? Here's what they could have done, Your Honor, and I think that's a very good question. Because are they in a box that they can't do anything that they won't get screamed about? Well, here are two things they could have done. One, they could have given him the 18-month notice in October of 2007. Followed their policies, unwritten and informal, but followed on every other shareholder in the record. Well, but their argument there is that if they had done that, as I understand it from the record, he would have received substantially less for his stock than he did when they actually called him. Because 18 months gets you then into the Great Recession and the crash in the fall of 2008. And they deliberately held off because the stock had gotten so low that they thought they were doing the employee a favor. What about this inference, Your Honor? If they let him know in October of 2007 when he leaves J.P. Morgan, our policy is to call your stock in 18 months. Wait a minute, Counselor. The question wasn't about all the inferences. The question was, as I understood it, what could the defendant have done so that your client wouldn't have sued? They could have followed the policy they followed on every other shareholder. Oh, given the 18-month notice? Yes. No, in October of 2007. Again, looking back, what could they have done to avoid this worry about entanglement? Well, you follow your policies. You don't try to make up something new on the fly. So they could have given him the 18-month notice and the three-month notice, which he didn't get. They could have told him, like they told the other two shareholders, we're deferring you because of undue hardship. They didn't care about undue hardship in December of 2011. They could have done the same thing they did for everybody else. Now, let's assume they didn't do that because they're worried about entanglement, a word the three executives all use exactly alike. Come the end of the arbitration testimony, Mr. Kamak has testified at deposition in front of their general counsel and the member of the management committee and Jonathan Zindel, all of whom participated in the decision. The trial testimony is done. It's fixed. The arbitrators are waiting for their decision. Why don't they tell him the truth then, that we made a decision in May of 2009, or maybe August if you believe CFO Zindel? Why don't they tell him the truth then, that we're going to call your stock as soon as the arbitration is over and ruled, and instead they tell him we make the decision on a month-to-month basis? It gets to our partial disclosure on the motion to amend for fraud. They don't tell him the truth. They mislead him by suggesting that the decision is made monthly when, in fact, they now take the position it was made two years earlier. There are things they could have done. You could have sued for that. Sued for what, Your Honor? For the misrepresentation or deception or whatever, or reliance on, you know. We could have, and we've tried, Your Honor, and that's obviously on the fraud claims. The district court did not find a lack of diligence. They found futility because there's no duty to disclose. And our argument is, under the cases Osterberger and Ashgrove cement, that if you make a partial disclosure, that partial disclosure can be just as much fraud as an active affirmative misrepresentation. If you lead somebody into your confidence, if you lead somebody into believing something isn't going to happen, then you have a duty to disclose the whole truth, not the half-truth. So, again, we agree, Your Honor, by misleading Mr. Kamak in May and June of 2011, we believe he has a cause of action for the negligent misrepresentation or the fraud, which is part of our motion to amend. I'm pretty sure if they'd have said anything at any time before the arbitration rule, relating that that could influence or intimidate a witness in the arbitration, that the arbitration would have exploded. It was that kind of a, I mean, look at the amount of money it issued. They couldn't, they couldn't, I mean, I've been a lawyer in those situations. They couldn't even turn around in a small closet without jeopardizing the proceeding. Your Honor, I think if we use the employment analogy, if you establish rules, policies, and procedures for how employees are to be treated, the rules and the procedure you go through determine it. We've got too many rules and not enough common sense in this world. I'm telling you what, in my experience and practice, was the reality of that situation. To affirm the district court, Your Honor, on the breach of good faith and implied duty, the court must ultimately decide that none of the other inferences that can be taken from the series of events where they treated him differently, they denied him notice, they misled him in May and June of 2011, none of those are reasonable inferences. None of those contain a grain of common sense. I believe they contain some. I don't say I'm going to win a trial. There's enough evidence here that a reasonable jury can determine that Mr. Kamak was retaliated against based on time, the actions, the disparate treatment, and the other things in our brief. I thank the court. I'll reserve my time. Mr. Chairman. Thank you, Your Honor. May it please the court. None of the inferences that counsel asks the court to draw and asks the district court to draw are reasonable. After years of discovery, briefing and so forth, the record is very clear. I would urge the court to take a look in the joint appendix at the internal memoranda at pages 1143 to 1146. That establishes, that shows, and it was undisputed, uncontroverted, that the decision to call Mr. Kamak's shares in accordance with normal practice was made in the spring of 2009, over a year before he testified, before the case against J.P. Morgan was even filed, although it was coming. It was within a month. A year later, in that same series of exhibits, What was the decision made in 2009, that they're going to wait until after the litigation was over? Yes. There were three, and that's the other point that those exhibits will show you. There were three individuals, three former employees, who had come up to the 18 months post-employment and whose stock was subject to being called. Three, Lopez, Lockwood, and Mr. Kamak. Kamak was obviously going to be a witness in the arbitration case. The stock price at that time was at a historic low, $8.48. To pay off the bank loans that Mr. Kamak took out to buy the stock would require the price to be at least $16.50. That's why he never wanted to sell it, because he always had to realize enough to pay that debt. Anyway, those three individuals were up for call, and in the spring, you'll see in those exhibits, the decision was made, let's defer because of the bad economy and the low stock price as to Lopez and Lockwood. And as to Kamak, for the additional reason that we've got this case coming up, he's obviously a witness in the case, and we don't want it to be entangled. A year later, in that same series of exhibits in the record, a question is asked by the Director of Human Resources to the fellow on the Managing Committee, Mr. Gilstrap, are we still holding this stock pending settlement of the case? The answer was yes. So Kamak was not singled out. He was not treated differently than similarly situated employees. Lopez and Lockwood stock was called in the fall of 2009, and Kamak stock was called at the conclusion of the arbitration case. And remember, the American Century affirmatively used his testimony as part of our case in chief against J.P. Morgan. We liked it. It wasn't adverse or bad for us. These reminder letters that were sent. I mean, that seems to me, if there's any one thing in this case that's troubling is those reminder letters. You know, depending on your perspective, you can say they were just innocuous, don't forget you can tender your stock like he would have ever forgotten, or they're some veiled threat. Well, they occurred in 2011. I mean, why would you need them? Do you think he would have ever really forgotten? Well, he had an opportunity. I mean, he knew he could tender it at any time, right? I think he probably did, yes. But since the time had passed, substantial time had passed, the market had now recovered.  I mean, it was established in the testimony. Once the case was submitted to the arbitration panel, the question was raised, well, should we call the stock now? And a decision was made. It's with that draft letter that Mr. Musil mentioned was written. And the decision was made, no, let's wait until the decision comes out and see what happens. Who knows what's going to happen? And so this reminder letter was sent. Now, there's two reminder letters in 2011. On their face, they are 100 percent accurate. There is nothing inaccurate about those letters. There is no contractual requirement in the stock restriction agreements that Mr. Kamak signed that contain the call rights. There is no entitlement to notice. Nobody is entitled to notice, either a notice of intent to call or a reminder or anything else. There is, to read that kind of element into the contracts goes, in our view, way beyond what the implied covenant cause of action contemplates because it would add terms to the contract. And that is not permissible under the case law on implied covenant. So had the letters been false, had the letter said, we do not intend to call your stock, don't worry. That's different. They didn't say that. They said, as a reminder, your stock is subject to being called at any time. And if you want to sell it back to us now at the current market price, you can. And had he done that. Was that in response to an inquiry? No, sir. No, that was in response to the case, the arbitration case being concluded, submitted and under advisement. That's when that took place. The reminder letter, the first reminder letter. In May of 2011. Then the decision came down in, I believe it was August of 2011. And the second reminder letter came after that because at that point, well, what's J.P. Morgan going to do? Are they going to appeal? Are they going to seek district court review, which they did? Is it final? What's going to happen? The second reminder letter was sent. Ultimately, J.P. Morgan threw up their hands, paid the award in full. Case was over. Stock was called. Well, I think to me the most, what most suggests or infers retaliation is the timing to deprive him of the special dividend. There's two dividends. Well, I know. At 2011. He'd been promised the one, but the second one was bigger. Well, the second one is the one that was paid out because of the $373 million arbitration award. Right. And I guess I would ask the court to consider, is it retaliation? Why shouldn't you have to argue to a jury that he deserved not giving that dividend because the dividend was the result of his misconduct, as revealed in the arbitration, as opposed to retaliating because I'm not sure what the plaintiff says about it. Right. It's clearly not retaliation. Because he testified, I think that's the least plausible. But I think it was retaliatory, at least in part. I think I would concede to the court that American Century did not want to pay any of the damages money caused by Mr. Kamak's conduct to him. But that is not retaliation. Why isn't the – is that a public policy jury issue? Not under the court's mandate. Nobody briefed that. Nobody's briefed it. Nobody's pleaded it. Nobody's took discovery on it. That's never been an issue in the case. And to make that business judgment is not retaliating for the substance of what he said in the arbitration, which is the public policy established in Kamak 1. Well, what you just said is inconsistent with something you said in your brief, however. And Judge Wolkin, a few minutes ago, talked about common sense. And in your brief, you say that none of the decision makers were aware of the substance of Kamak's testimony. That's true. Now, are we to believe that – so then how would they know that they wouldn't want to pay him the dividend? Well, they knew what he did when he was employed at JPMorgan. So the general counsel who was at the deposition, the senior executives of the deposition, never briefed the people who were involved in the decision about the substance. Now, I understand they said they didn't read it, but that's different than knowing the substance. So they didn't – so the decision makers didn't have any idea what Mr. Kamak testified to. They were just totally in the dark. The two decision makers whose depositions were taken in the case so testified. The CEO – They testified they didn't read it. That's not the same as not knowing the substance. I think Mr. Thomas, the CEO, said he had no idea what Kamak had said. Now, yes, the general counsel attended from time to time. The general counsel didn't brief the CEO on the testimony of one of the most crucial witnesses in the arbitration. Not the most crucial. That's a little bit – that's a little hard to believe. I'm not arguing that either. Okay. It is reasonable for everybody to assume that upper management – everybody was aware that Kamak was a witness in the case. That's why the decision to defer the call was made. The question is when they said let's make the call, were they saying we really don't like the testimony that he gave? Well, you just said that might have been one of the reasons. No, I don't – I hope I didn't say that. You said because they didn't want to pay him the – they didn't want to pay him the special dividend because they didn't like what he said in the deposition. No, they didn't like what he did as an executive at J.P. Morgan. But it's the same thing. It's not the same thing, Your Honor. It's not the same thing. That's – he did not testify – the testimony in question that we're talking about here in the deposition and live testimony at the arbitration is not the equivalent of everything that Mr. Kamak did over his tenure at J.P. Morgan from 2003 through 2007. You should not equate those. There's certainly nothing in this record that would suggest that everything that Mr. Kamak did was covered in his testimony. In fact, it was not. And the testimony itself, both the deposition and the live testimony, is in this record. Is there a Missouri case law that clarifies whether the public policy is the fact of testifying versus the substance of the testimony? Not that I'm aware of, Your Honor. I will tell you that the Lucero case, which we've cited and I believe was cited in the first opinion, Lucero versus the University of Missouri, is, I believe, the leading Missouri case law on the scope of the implied covenant. It sets a standard of substantial evidence to make out a claim and to survive summary judgment. It is the test that the district court applied here. But on that question, is it the fact of testimony or what was said? I'm not aware of any particular case law. But if you think of it. I mean, is it against public policy if an employee testifies under subpoena that he or she has violated company policy and adversely affected the company's interest to then fire the employee? Is that violating the testimony of public policy? That's a close case. I think that it should be. I mean, to say you can't, to retaliate because someone participates in the judicial process by testifying is different than the substance of testimony revealing that discipline is appropriate. If somebody testifies. They're two different questions. Two different questions. I totally agree. If somebody testifies under oath, I've been embezzling from the company for years. And then that employee gets fired. Are they being fired for embezzlement or because they testified about it? It's the embezzlement. They are two different things. And that's what we have here. Actually, there is a fairly well-developed body of case law on that very issue in the FELA context. I've actually had several of those cases over the last couple of years. It's basically saying reporting an injury under FELA is protected, but the underlying conduct that may result from the reporting is not if there's misconduct. But that's a different area. It's a different area, but it's actually somewhat analogous. It does sound analogous. I have not examined that. It has not been argued in this case or presented at the district court. There's one other thing before my time runs out that I do want to emphasize to the court, and that is when all of this briefing was being prepared at the district court level on the motion for summary judgment, I would submit to the court that it became clear to everybody that summary judgment was coming because there really was no evidence. That's when, for the first time, you got this motion for leave to amend and Mr. Kamak affirmatively moving for summary judgment on the existing second amended complaint on an entirely new theory, never in the case, never argued before, and that is that the call rights were unenforceable because they were somehow inconsistent with the original stock option plans from back in the 90s, pursuant to which the contracts were in. Is this the third amendment that you just said? In the proposed third amended complaint that was rejected, that theory was alleged. At the same time, Mr. Kamak moved for summary judgment under the second amended complaint, the operative one, on the theory that the call rights were unenforceable and we, American Century, had not met our burden of proving that. Well, that's significant for a couple of reasons. First of all, the implied covenant assumes a valid enforceable contract. That's what was alleged in the second amended complaint. That's what we've all perceived in it. To, at the very last minute, facing summary judgment, say, wait a minute. It's really not an enforceable contract. The call rights are unenforceable, totally inconsistent. The district court denied that motion for summary judgment. I think it's 735 in the record. Holding that enforceability of the call rights is really not an element, an issue, in our implied covenant analysis, good faith analysis. And then denied leave to amend because it was untimely. It was based on arguments that could have been presented earlier. It was inconsistent with the mandate. The various theories failed to state a claim and so on and so forth. That order was submitted to you as discretionary. But the point I wanted to make to you here at the end of my time is that that filing, those two filings, the proposed amendment and the motion for summary judgment on the enforceability of call rights, I believe the court should find is an admission by CAMAC, a concession, if you don't want to use an evidentiary term, that the retaliation claim has failed. And the other thing that is significant, and then I'm going to sit down, is that in the proposed third amended complaint, CAMAC alleges, 288 in the record, that the call rights, that the decision to make the stock call took place in 2009. It's a year before the testimony. You've already covered that and you're way over your time. Thank you. Time for a vote. Two minutes, 40 seconds. In CAMAC 1, there was a veiled threat from the letter in May, right after his testimony. In October, right after the decision, they sent him another reminder letter. They called his stock on December 9th. If they wait until December 10th, he gets his annual dividend and he gets a special dividend because you had to call before the 9th or the shares continued through that month. So they call his stock on the day that denies him the annual dividend and the day that denies him the special dividend. Now, they respond, but that dividend was then baked into the price because everybody knew at that point that the judgment was going to be paid. Part of the annual dividend, some part we don't know. Their expert says maybe 80 percent, but he's never tried to pin it down. Some of that's baked into the annual dividend. None of it's baked into the special dividend. On the 2009 decision? Well, have you got law that says the substance of the testimony can prompt that the public policy includes retaliation for the substance of testimony? I do not. What I have, Your Honor, and I think that's what you're arguing, because the decision that he shouldn't get the special dividend seems quite understandable given the nature of its source and his participation in its creation. The case that is relevant on that point, I think, Your Honor, is the Drury case, where Missouri established the importance of unfettered, unfearful, no reprisal testimony in a public setting. And at page 567, it quotes the Supreme Court about talking about employer-employee relations and the potential for adverse action and reprisals that will lead an employee not to want to testify at all or not to want to testify truthfully. That's the principle that's at stake here. If this case is upheld and you say a discretionary right to call can be called at any time because we do it to everybody else, you've shredded CMAQ 1, which said you can't do it for a violation of public policy. And we have inferences of timing, inferences of different treatment, inferences of not liking his testimony, inferences of the general counsel and the associate general counsel and the decision-maker on the management committee hearing his testimony, and then they take the actions they do at each stage, including the May 11, 2011 and October 2011 letters were truthful in that they have a right to call his stock. But when he asked specifically, are you going to call my stock, they said, we decide that on a monthly basis. They can't have it both ways. Your light just went off. I thank you for your time, Your Honor. Your Honors. Thank you, Counsel. The case has been thoroughly briefed and argued. We take it under advisement.